

FILED

8/31/2021

NG

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| RACHEL M. HUBBARD | ) | |
| | ) | |
| **Plaintiff pro se** | ) | **Case No.: 1:20-cv-06680** |
| | ) | |
| v. | ) | **Judge Edmond E. Chang** |
| | ) | |
| GASPEREC ELBERTS | ) | **Magistrate Judge Susan E, Cox** |
| CONSULTING, LLC | ) | |
| | ) | |
| **Defendant** | ) | |

## PLAINTIFF'S REPLY TO
## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR LEAVE TO FILE
## AMENDED COMPLAINT AND ADD PARTIES

Plaintiff pro se, Rachel M. Hubbard ("Plaintiff" or "Plaintiff pro se"), in Response to Gasperec

Elberts Consulting LLC, ("GEC") Response in Opposition to Plaintiff's Motion For Leave to

File Amended Complaint and Add Parties respectfully states as follows:

**Please Note**: Plaintiff acknowledges her filing is a day late and states she has been working

diligently on her Response and has spent every night after work doing so since receiving

Defendant's Brief on August 16, 2021. Plaintiff worked non-stop since Sunday night to reduce

the number of pages and provide as much clarity as possible and just finished just moments ago.

# I

## PURPOSE AND TIMING OF
## PLAINTIFF'S PROPOSED AMENDED COMPLAINTT

When Plaintiff filed her Motion For Leave to File her Amended Complaint, Plaintiff believed it would be addressed by the Magistrate, Judge Cox who would be able to extend the discovery dates. This was apparent to Judge Cox and she commented on it during the telephonic hearing on July 27, 2021, regarding Plaintiff's Motion to Extend Discovery dates. (Dock. #56) Plaintiff misunderstood the transfer of the case from District Judge to the Magistrate Judge and the extent of her supervision. Since discovery began, Plaintiff has had to reduce her work hours in order to research and file her Motions. Plaintiff spent a considerable amount of time to draft her Proposed Complaint as evidenced by the number of pages. Plaintiff did not sit on her hands and wait to cause any undo delay. Each day during the last two weeks Plaintiff has spent every available moment outside of work to draft her Response to Defendant's Brief working well into the night. Plaintiff argues she has not caused undue delay or acted in bad faith. Defendant has known since the Parties served their Initial Disclosure, Plaintiff's allegations and it would be disingenuous for GEC's attorneys to pretend otherwise. Defendant's summary of the evidence Plaintiff has gathered in not based in reality. Surely, if Plaintiff were just conducting a fishing expedition, as Defendant's claim, no reasonable attorney would just sit idly by and allow such behavior and the Court should consider this during its review of Plaintiff's Proposed Amended Complaint.

The facts presented in Plaintiff's Amended Complaint, are worthy to be considered and Plaintiff argues the particulars of this case are of public concern. It would be reasonable for the Court to consider her Amended Complaint based on the individual facts and not in a nutshell, as

Defendant's attorneys desire. This Court's consideration of the Proposed Defendants and the facts should be treated separately. The Court should also consider the alleged collective behavior of the Proposed Defendants and the behavior of GEC and its individual owners separately because had they not provided false information to the City of Chicago regarding its affiliates and the involvement of Mackie in particular, Plaintiff would not be able to raise what she believes to be public concerns. The FOIA documents that Plaintiff received are public and were obtained because of genuine concerns of fraud. At the time, Plaintiff did not even know she was being paid less than her male comparator, and thus, had no other motive for seeking them. When Plaintiff filed her Charge with the EEOC she had an in-person interview which allowed her to address her unequal pay claims. She also provided her written Response to GEC's Position statement and described as best she could the circumstances and involvement of the Proposed Defendants. Defendant's attempt to frame Plaintiff's Proposed Amended Complaint as an expansion or an effort to harass is unfounded and is not supported by the facts. At the time, Plaintiff lacked any meaningful knowledge of Title VII or its relevance to her subsequent Complaint. After Plaintiff filed her Complaint Defendants took deliberate steps to change their corporate structure and create the appearance of separation between them and GEC. It is not reasonable to believe that GEC would end its participation in the Proposed Defendant's health plan, 401(k), and the numerous other shared activities immediately after Plaintiff filed her Complaint if it was in fact innocent. The timing is suspect and does not make sense for financial reasons. However, it makes perfect sense for liability reasons.

Discovery has been exhaustive but has also been extremely productive. The witnesses have tried to align their denials but have also provided contradictory testimony. Plaintiff has been able to impeach several of the witnesses and has been able to determine their shifting

defenses. Plaintiff has obtained relevant facts and supportive documents to support her single employer allegation and asks the Court to grant her Motion to Amend her Complaint for the purpose of adding relevant facts and to add the Proposed Defendants.

The Seventh Circuit has elaborated that amendments should be allowed "unless there is good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." Life Plans, Inc. v. Sec. Life of Denver Ins. Co., 800 F.3d 343, 358 (7th Cir. 2015).

**II**

**PLAINTIFF'S CLAIM THAT DEFENDANTS
ACTED AS ONE EMPLOYER IS A NOT A NEW THEORY
AND IS BASED IN FACT**

Starting from the time Plaintiff learned of the CAD position she eventually held with GEC, the Proposed Defendants were involved. From recruitment, interview, hire, during her employment and after her employment, The Burke Group, Mackie and CBBEL were involved. There is absolutely no evidence that Plaintiff made up an elaborate theory to simply accuse, harass or embarrass the Proposed Defendants. Plaintiff's resume shows that she worked for a minority owned firm before and from the time Plaintiff was notified by her recruiter who she was interviewing with, she knew something was starkly different from every other job she held.

Plaintiff was the only employee who did not originate from any other the proposed Defendant companies and saw first-hand how they worked together to support GEC. Plaintiff thought it strange how everyone clearly had established relationships and seem to operate under a set of unwritten rules which was never provided or shared with Plaintiff. They acted boldly and never sought to hide their collective efforts in the office. GEC never established any rules of its own, and Plaintiff believes they thought she either did not care or that Plaintiff would just go

along with their collective efforts. It has taken almost four years for Plaintiff to understand their elaborate scheme and believes it should serve as a case study for certifying agencies who oversee these programs. This case is not about revenge and Defendant cannot put forth any argument based in fact, that Plaintiff was acting in bad faith. GEC relied upon The Burke Group, Mackie and CBBEL for everything. Megan Elberts reliance on her family's companies was clear and has never been based on a theory. The Proposed Defendants can blame no one except themselves because they did not operate at arm's length, and did not respect corporate formalities. However, the potential rewards from having a stake in a certified minority and disadvantaged-owned firm are exceedingly great and motivates some to ignore the risks. The Proposed Defendants are solely responsible for this case and cannot look to anyone else for blame.

The Court should not be fooled into thinking that the Proposed Defendants do not bear any responsibility for this case and should reject their conclusory arguments that are not based in fact.

### III

### <u>DEFENDANT'S CLAIM THAT PLAINTIFF'S PROPOSED AMENDMENT ASSERTS AN ADDITIONAL RETALIATION THEORY UNDER COUNT IV THAT DID NOT OCCUR IN "VERY CLOSE" TIMING IS FACTUALLY FALSE</u>

GEC, in its response, did not deny that Plaintiff provided evidence that she reported GEC and the proposed Defendants for what she believed to be WBE\DBE fraud. GEC also cannot deny that Plaintiff raised these concerns with the EEOC. GEC also cannot deny that she identified Martin Burke, Christopher Burke, The Burke Group in her position statement to the EEOC. Instead, Defendant argues that the theory of alleged events occurred more than a year from the time Plaintiff alleges the *ultimate* adverse employment action occurred. However,

Plaintiff's existing Complaint Count IV and her proposed Amended Complaint Count IV repeats and re-alleges paragraphs 1-33 and 1-66, respectively. Plaintiff argues the first retaliatory adverse employment action took place on September 18, 2018, when Megan Elberts drafted and presented Ilir Schtembari's offer letter for the same position Plaintiff held at a higher rate of pay, and he accepted. This was **one day** after September 17, 2018, when Plaintiff received the email invite for the WBE\DBE meeting with Maura Downs. More specifically, according to the City of Chicago Procurement Services FOIA Log on August 8, 2018, the City of Chicago received the FOIA regarding GEC. Sometime in August 2018, GEC's attorneys at Taft Stettinius & Hollister LLP ("Taft") received the FOIA request. Their response was due by August 28, 2018. **(Exhibit A1: PPS1556-PPS1557 - Chicago Procurement Services FOIA log).** In the interim, Defendant prepared its response to the FOIA request. **On September 17, 2018**, Plaintiff received the email invite from Megan Elberts for the WBE\DBE meeting with GEC's WBE\DBE legal team representative, Maura Downs. Plaintiff immediately knew that GEC had received the FOIA request. **(Exhibit B1: PPS1588 – GEC's WBE\DBE Email Invite - Excluded) On the same day**, Defendant interviewed Ilir Schtembari for the CAD position he eventually held. **(Exhibit C1: GEC0170-GEC0171 – Recruiter's emails – Subject to PO) On September 18, 2018**, Megan Elberts drafted and presented Ilir Schtembari's offer letter to his recruiters at Michael Page. Ilir verbally accepted the offer letter the same day. The offer letter is dated September 18, 2018 and signed by Megan Elberts and Ilir Schtembari. **(Exhibit D1: GEC0172 – Ilir's signed Offer Letter – Subject to PO)** The offer letter was essentially identical to Plaintiff's offer letter but offered to pay Ilir more than. Plaintiff also notes there was no mention of any Microstation, CAD Tech II, IDOT, Tollway, or 3-D skills or experience in Ilir's offer letter or in any of the verified reference documents provided by his recruiter. **(Exhibit D1: GEC0172 - Ilir's Signed**

**Offer Letter – Subject to PO) (Exhibit E1: GEC0170-GEC0171 – Ilir's Recruiter emails – Subject to PO) (Exhibit F1: GEC0174-GEC0176 – Ilir's Recruiter's Reference Check Forms – Subject to PO)** On September 25, 2018, Plaintiff met with Maura Downs who is part of the WBE\DBE legal team from Taft, per Megan Elbert's email invite. During that meeting we were warned not to say we worked for the proposed Defendant businesses and don't say anything that we wouldn't want to say to Megan or Lisa's face. Immediately after the meeting Ms. Downs asked Plaintiff if she knew Ms. Jackson, the attorney that sent the FOIA on Plaintiff's behalf. On September 27, 2018, Plaintiff received GEC's response to the FOIA. On October 8, 2018, Ilir Schtembari began his employment as CAD Technician. Plaintiff argues this was Ilir's start date and not his date of hire, which occurred on September 18, 2018. Plaintiff alleges the FOIA was the underlying reason why Defendant sought to hire Ilir Schtembari.

Plaintiff argues the act of retaliation is not limited to termination or acts meant to force an employee to resign. Retaliation also includes transferring the employee to a less desirable position. During Megan Elbert's deposition on May 18, 2021, Plaintiff asked, "Ms. Elbert(')s, Have you ever alleged Plaintiff was hired as a CAD Tech II?" Ms. Elberts: "As we reviewed last time on your offer letter, the offer was for a CADD technician. At the time, we did not have multiple levels of CADD technicians, in August 2017?" **(Exhibit G1: Elbert's Dep. May 18, 2018 (Signed) - Pg. 8 - Lines 4-6)** Following this exchange, Ms. Elberts admitted for the first time that GEC did bill Plaintiff at the CAD Tech II rate but tried to assert a but for mistake claim to explain the pretextual reason. **(Exhibit H1: Ebert's Dep. May 18, 2018 (Signed) - Pgs. 20-21, Lines 3-25 & 1-6)**

However, this explanation too was pretextual, contradicted by Russell Olsen and other forms of documentary evidence (Emails & Plaintiff's New Employee docs.) explanation(s) for his hire are provided in the following paragraph. Plaintiff argues any Trier of fact could conclude Defendant's true motives for his hire could be related to Plaintiff's first protected activity. Plaintiff does not merely allege very close timing of these events, but she also has produced supportive documentary evidence that confirm these events occurred on the dates contained herein

## IV
## DEFENDANTS SHOULD NOT BE GRANTED
## SMALL EMPLOYER EXEMPTION

In support of this claim GEC cites Prince v. Appleton Auto, LLC, 978 F. 3d 530, 534 (7th Cir. 2020); and Papa v. Katy Indus., Inc., 166 F.3d 937, 941 (7th Cir. 1999). In both cases the Courts determined that integration alone was not enough to pierce the corporate veil. In the current case, Plaintiff not only argues that the proposed Defendants integrated their operations, but also that GEC, as a WBE and DBE certified firm, was (and is) restricted from doing so in the manner envisioned by the small employer doctrine. The common llc and corporate formalities are a given but should be seen through the lens of GEC's actual corporate structure. The legal and corporate formalities for a WBE certified firm are restrictive, are in addition to those of a non-certified firm and are governed by the City of Chicago's Procurement Office. ("CCPO") Likewise, the legal and corporate formalities for a DBE firm are governed by Regulation 49 CFR Part 26. Not only are there business size restrictions, but there are individual and business income and gross receipt limits. These regulations and the duties of each participating owner and business are ongoing and require independence and control of the certified firm and each

individual owner. These regulations do not just apply to the certified business and individual

owners, but also to its affiliates. Both regulations require disclosure of affiliates and GEC never

CBBEL or Mackie as such. Neither of these regulations allow certified firms to share employees

or equipment and require full disclosure. When Lisa Gasperec and Megan Elberts certified under

penalty of perjury that their statements were true and correct to the best of their knowledge, they

were bound to abide by these rules. Likewise, when they received their DBE certifications from

the City of Chicago on September 12, 2017, they agreed to abide by those rules as well. Their

applications covered not only their status at the time, but also included a 5-year lookback. In

addition, the importance of obtaining access to municipal, state, and federal contracts is no secret

and should not be understated. Megan Elberts was asked specifically about GEC's "relationship

with Mackie as part of its certification application and she certified, "The relationship between

GEC and Mackie is a business relationship. Mackie does not provide any service to GEC. GEC

does not share space, employees, equipment(,) or any other resource with Mackie. GEC does not

have any common ownership or common management with Mackie. GEC does not have any

leasing relationships with Mackie. There have been times when GEC and Mackie worked for the

same client. Any time that has happened the work was done entirely by each company's

respective employees and worked done by GEC has been at my sole discretion." Not only did

Plaintiff produce GEC's shared work schedule which showed Michael Dawson and other Mackie

employees performed GEC's work for the same client, Plaintiff's supervisor, Russell Olsen

testified during his deposition on July 13, 2021, "… he (Tarik) was doing, and along with Mike

Dawson was doing work. We were overloaded. We had one person drawing – yeah." **(Exhibit I1:**

**Olsen Dep. July 13, 2021 (Refused to sign)– Pages 60-61)**

**V**

## PLAINTIFF'S PROPOSED AMENDED COMPLAINT
## ASSERTS THE PROPOSED DEFENDANTS
## DID MORE THAN JUST INTEGRATE THEIR OPERATIONS

Defendant's response to Plaintiff's Proposed Amended Complaint essentially seeks to dismiss Plaintiff's allegations against the Proposed Defendants as if to say, so what. However, documentary evidence shows the Proposed Defendants did much more than just integrate or just participate in a multi-employer plan. The documentary evidence produced during discovery shows that the multi-employer plan was only for 401(k) and health benefits and nothing more. Defendant never produced any documentary evidence to support their claim that the multi-employer plan covered anything else. Throughout discovery the witnesses attempted to provide cover for GEC and distance from Mackie and CBBEL, and offered contradictory testimony during their depositions, and on several occasions, perjured themselves.

Despite GEC's attorneys claim that Mackie and CBBEL were simply affiliates of GEC, there is no documentary evidence or witness testimony that shows they ever publicly acknowledged themselves as affiliates. GEC has never been showcased on Mackie or CBBEL's websites and they were never identified as affiliates in any way. The Court should not be swayed by this claim as it is not supported by the evidence.

In fact, Megan Elberts testified, and the documentary evidence shows that after Plaintiff filed her Complaint in Federal Court, GEC ended their participation in the multi-employer plan and established their own 401(k) plan for the first time. Days before Christmas shared employees of CBBEL and Mackie, along with GEC, attempted to remove Plaintiff from The Burke Group 401(k). Not until Plaintiff threatened to file an emergency motion, did they withdraw their demands that Plaintiff transfer her assets to GEC's 401(k) plan. GEC did not attempt to force any

other former GEC employee out of The Burke Group Plan and Plaintiff's former supervisor testified he remained in The Burke Group's Plan despite ending his employment earlier this year.

Plaintiff argues that under state and federal law, and more specifically, under Title VII, retaliation is not limited to discharge and Defendant's argument that Plaintiff must show that the alleged events should relate to only one form of retaliation is incorrect. The focus of a Title VII retaliation claim is an adverse employment action, *such as, but not limited to,* firing, demotion, or reduction in pay. In the case of Collins v. State of Illinois, the Court determined, "Adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." (Collins v. State of Illinois, 830 F.2d 692, 703 (7th Cir.1987)). In the current case, Plaintiff alleges that after she raised her claim of unequal pay, Defendant, for the first time, sought to draw a distinction between Plaintiff's position and that of Ilir's by claiming he was hired as a CAD Tech II and Plaintiff was hired as a CAD Tech I. This essentially, acted as a demotion evidenced by a less distinguished title. None of the witnesses during their depositions supported this claim and no documentary evidence has been produced to show that Plaintiff was hired as a CAD Tech I or that Ilir was hired as a CAD Tech II. Plaintiff and Ilir's former supervisor, Russell Olsen, testified during his deposition on July 13, 2021, the following. Plaintiff: "Okay. And do you know who was CAD tech 2 …"  Mr. Olsen: "No, I don't know. I really never did know that." **(Exhibit J: Olsen Dep. (Refused to sign) - July 13, 2021, Pgs. 223-224, Lines 20-25 & 1-5)** Additionally, Plaintiff asked Megan Elberts during her deposition the following, "Can you tell me whether -- did you ever present a description in written form or otherwise of the exact position that I interviewed for?" Ms. Elberts: "I do not believe so. As I stated earlier, we were a young company. We did not have hiring procedures in place. I do not believe we had formalized job descriptions at the time. Plaintiff argues absolutely

no job descriptions were ever produced during her employment or during discovery and a Trier of fact could find that the distinctions did not exist, were irrelevant or did not relate to any job description. Plaintiff alleges GEC's decision to pay her male comparator more for the same position she held was the beginning of GEC's adverse employment actions. The reasons given are pretextual, was retaliatory, and it has not provided any non-discriminatory reason for these adverse employment actions. In the case of Crady v. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices that might be unique to a particular situation.* In the current case, GEC's proffered reasons for Ilir's hire and his pay have been disputed. Both sets of reasons have been disputed by the evidence. In addition, when GEC hired Ilir, it was in close proximity to Plaintiff's first protected activity. It was only after Plaintiff raised her that GEC provided pretextual reasons for Ilir's hire which all point to the date Ilir was hired and have been proven false.

## PLAINTIFF'S PROPOSED AMENDED COMPLAINT WOULD NOT CAUSE PREJUDICE

Plaintiff's Amended Complaint would not cause prejudice to GEC because these issues are not new. Plaintiff did raise these issues with the EEOC as evidenced by her written Response to GEC's Position Statement. It is not reasonable to conclude that these allegations were not known to each of the Proposed Defendants. Not only did they operate a closely held owned consortium of engineering companies, but the owners are all family members. Plaintiff has never wavered from this position and described them as one employer. Even during Plaintiff's

employment, when Plaintiff's former attorney, Douglas Werman, sent his demand letter, it was addressed to Carl Yudell, who is not only the Registered Agent GEC, but also the Registered Agent for most of The Burke Group's member companies, including Mackie and companies owned by Christopher Burke. It would be unreasonable to conclude that they were unaware of the demand letter, Martin Burke testified during his deposition that he was aware of the legal dispute between Plaintiff and GEC prior to him receiving a subpoena for his deposition because Megan Elberts told him. **(Exhibit K1: Martin Burke Dep. (Refused to sign) – June 24, 2021, Pg. 7-8, Lines 17-25 and 1-9)** Although Mr. Burke claimed he did not know of the Complaint at the time it was filed, a Trier of fact could conclude it would seem implausible that he did not know about Plaintiff's claims. Additionally, **b**ased on Megan Elberts and Trudy Buehler's testimony and their dependance on Martin Burke as their "mentor" a Trier of fact could also conclude that Megan Elbert's family knew about Plaintiff's claims, her EEOC charge, and her current Complaint. Even when Plaintiff attempted to serve Martin Burke and the Mackie employees subpoenas for their depositions, Martin Burke testified that he received the subpoenas even before Plaintiff was able to serve them. Throughout every step, GEC and the Proposed Defendants caused Plaintiff to spend unnecessary time and resources to serve them only to find they had the subpoenas all along.

GEC's claim that it would be extremely prejudiced is not an argument made in good faith. GEC cannot claim that it was unaware of these allegations or that it was unaware of Plaintiff's argument that these companies acted as one because each witness was identified, and Plaintiff gave proper notice in her Initial Disclosures regarding the subject matter. **(Exhibit L: Plaintiff's Initial Disclosures in Relevant Part)** GEC's claim that it would have to start all over is just factually untrue. GEC has had the ability to investigate and challenge Plaintiff's claims

during discovery but chose to obstruct Plaintiff's ability to explore these topics with every interrogatory and witness. In addition, GEC claim that Plaintiff was on a fishing expedition is odd given that GEC never filed a Motion to Quash or limit the scope of Plaintiff's subpoenas. Despite these obstacles, Plaintiff was successful in obtaining admissions to support her claims. GEC's claim that she did not seek to depose CBBEL or Christopher Burke is also false. Plaintiff did file a Motion to Extend Discovery and the Magistrate properly construed Plaintiff's request not only to allow Cristopher Burke to be served but to allow him to participate in limited discovery if needed. (Dock. #) In addition, Both Martin Burke and Christopher Burke are part owners of Mackie and

GEC's declaration that it is prepared for summary judgement is somewhat aspirational and its path is not as clear cut as it would like the Court to believe. Megan Elberts testified during her deposition that she was told there was a verbal agreement. Not only was this not truthful, but GEC knew it. The *theory* was merely a strategy to claim a verbal agreement and was crafted and presented by GEC after Plaintiff filed her Complaint based on an overzealous attorney, Keith Hunt whom GEC never presented during discovery. If the Court recalls, on December 11, 2020, the Court took note of their claim made its Minute Entry which essentially presented GEC the opportunity to file an early summary judgment motion if it believed that an enforceable verbal settlement agreement was entered into by the parties. (Dock #14) Defendant has maintained this claim for over 8 months knowing their claim was false. With tactics like these, the Court should reject Defendant's claims of undue prejudice and delay as Plaintiff has had to exhaust valuable limited resources to dispute claims that were never true. Plaintiff asks that the Court consider each of these factors in its decision.

## **CONCLUSION**

GEC has known of Plaintiff's claims since Initial Disclosures. In addition, considering the shared goals, shared activities, and shared legal representatives of the Proposed Defendants, it would be implausible for any Trier of fact to believe the Proposed Defendants did not know of Plaintiff's claims, and should have known and anticipated Plaintiff's Complaint and their inclusion. Plaintiff asks this Court to consider her Motion and the Proposed Defendants separately and take into consideration the public concerns that are implicated based on the facts she has presented. GEC has provided numerous contradictory statements and shifting defenses to her former attorney, Douglas Werman, to the EEOC, and to this Court regarding Plaintiff's hire, her pay, her male comparator's hire, and the circumstances regarding the end of Plaintiff's employment. Plaintiff's primary goal has always been to bring these inconsistencies to the Court's attention as well as the underlying motives for their adverse employment action. Plaintiff argues her claims are based in fact and are not based on a theory that she magically developed overnight. It is plausible that an analysis of the facts could lead a Trier fact to conclude the underlying motives were directly related to Count I which are repeated and realleged in Count IV. In the case of Burton v. Freescale Semiconductor, Inc. 798 F.3d 222, 239-40 (5th Cir. 2015) (the Court held that a jury may view "Erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination."); McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 283 (5th Cir. 2000) (summary judgment was reversed which had been entered for the employer in a discrimination case partially because the employer's report to the EEOC "contained false statements. . . ."). In the case of Miller v. Raytheon Co., 716 F.3d 138 (5th Cir. 2013). A jury verdict was affirmed in an age discrimination case partially because "[a]t trial,

2/10/2020    City of Chicago :: FOIA Request Log - Procurement Services

**PPS1556**



(/content/city/en.html)

# FOIA Request Log - Procurement Services

**View information on how to submit a FOIA Request to the Department of Procurement Services** (/content/city/en/depts/dps/supp_info/dps_foia.html)

Below we have included summaries of all FOIA requests received May 1, 2010 to present.

Click **Menu** in the upper right-hand corner of the Data Player below to: view, print, or download this data set or access the data via API. To sort or remove columns, click **More Views**. Click the **Share** button on the left, which is just below the Menu button, to email data or post to social networks. To view the date last updated, click on the **Info** button, which is on the right just below the City seal.

Before downloading or sharing data, please read the Terms of Use (/city/en/narr/foia/data_disclaimer.html). For more information or assistance Contact Us (/city/en/general/contact.html).

**FOIA Request Log - Procurement Services (https://data.cityofchicago.org/Government/FOIA-Request-Log-Procurement-Services/bcyv-67qk)**

# PPS1557

| REQUESTOR NAME | ORGANIZATION | DESCRIPTION OF REQUEST | DATE RECEIVED | DUE DATE |
|---|---|---|---|---|
| Madison Hopkins | Better Government Association | All records related to all modifications/amendments for contract numbers 24994 and 24288. To be clear, these are the contracts w | 7/31/2018 | 8/14/2018 |
| Tim Novak | Sun-times | I am seeking records regarding the concession agreements at O'Hare and Midway airports involving Westfield Concessions and | 8/1/2018 | 8/15/2018 |
| david johnson | | I am requesting documents stating how many employees in this department make over $75,000 a year | 8/14/2018 | 8/21/2018 |
| Shirianne Lemm | Illinois Electronic Security Association | Copies of any contracts between the City of Chicago and KBS Computer Services executed between January 1, 2017 and today. | 8/14/2018 | 8/21/2018 |
| Joe Elberts | | FOIA log. How often is this updated? | 8/16/2018 | 8/23/2018 |
| Frank Newell | Loevy & Loevy | As a follow-up to your letter of July 26, 2018, we submit a modified version of request #4 of our May 14, 2018 FOIA request. This | 8/10/2018 | 8/24/2018 |
| Breanna Kantor | Henderson Parks | Copies of: | 8/17/2018 | 8/24/2018 |
| Dan Mihalopoulos | WBEZ 91.5FM | Please provide any and all records indicating the ownership stakes in all of the vendors, including restaurants and retail shops, that | 8/17/2018 | 8/24/2018 |
| Dan Mihalopoulos | WBEZ 91.5FM | Please provide a list of all public relations firms that have been paid by the City of Chicago to provide services since May 1, 2011. | 8/17/2018 | 8/24/2018 |
| Dan Mihalopoulos | WBEZ 91.5FM | Please provide copies of all documents related to direct voucher payments and any other payments to MK Communications Inc. | 8/17/2018 | 8/24/2018 |
| Tierra S. Jackson | Loevy & Loevy | requesting documents regarding the WBE and DBE certification of Gasperec Elberts Consulting, LLC. This request includes all forms and documents submitted for certification, including all ownership information, certification history, financial information, licenses and registrations, including all current business licenses, individual licenses, employee information, permits and pending applications, all emails and correspondence between Gasperec Elberts Consulting and the City of Chicago Procurement Office as well as bid applications and awarded contracts. | 8/6/2018 | 8/27/2018 |
| david johnson | | Procurement services, requesting documents stating the addresses of the locations for the department of procurement services | 8/21/2018 | 8/28/2018 |
| KC Chew | | For contract 21472 and all of its modifications from 2009 through 2018, I would like to request prime and subcontractor payment r | 8/21/2018 | 8/28/2018 |
| Mark Atkins | Benchmark Construction | I am requesting any and all documents regarding claims, including all correspondence and settlements to these claims between the | 8/15/2018 | 8/29/2018 |
| Elly Smith | Gardner Webb University | I'm a grad student at Gardner Webb University in North Carolina. I was hoping you could help me with our project. | 8/27/2018 | 9/4/2018 |
| ROBERT E. BLOCH | | I am requesting the following records: | 8/20/2018 | 9/4/2018 |
| KC Chew | | For contract 27068, I would like to request prime and subcontractor payment reports, utilization reports, modifications or amendm | 8/28/2018 | 9/5/2018 |
| Christine Williams | | requesting documents stating who is the head of this department The exemptions used by DPS do not fit for request #2. | 8/27/2018 | 9/5/2018 |

1

1      THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3  _____

4  RACHEL M. HUBBARD,

5          Plaintiff,

6      v.                          Case No:

7  GASPEREC ELBERTS CONSULTING, LLC,      1:20-cv-06680

8          Defendant.

9  _____

10        VIDEOTAPED DEPOSITION OF MEGAN ELBERTS

11  DATE:          Tuesday, May 18, 2021

12  TIME:          2:03 p.m.

13  REPORTED BY:   Danielle Sargis, CER-1017

14  JOB No.:       6121

15

16  Conducted by videoconference via the Remote Legal

17  platform

18

19

20

21

22

23

24

25

```
                                                          2
  1               A P P E A R A N C E S

  2    ON BEHALF OF PLAINTIFF:

  3         RACHEL M. HUBBARD, PRO SE

  4

  5    ON BEHALF OF DEFENDANT:

  6         VICTORIA VANDERSCHAAF, ESQUIRE

  7         Litchfield Cavo LLP

  8         303 West Madison Street, Suite 300

  9         Chicago, Illinois 60606

 10         vanderschaaf@litchfieldcavo.com

 11         (312)781-6686

 12

 13         KEARNEY W. KILENS, ESQUIRE

 14         Litchfield Cavo LLP

 15         303 West Madison Street, Suite 300

 16         Chicago, Illinois 60606

 17         kilens@litchfieldcavo.com

 18         (312)781-6630

 19

 20    ALSO PRESENT:

 21         Lance Zacker, Remote Legal

 22         Laurie DePalma, Notary Public

 23

 24

 25
```

REMOTE LEGAL
COURT REPORTING
646-461-3400

**MEGAN ELBERTS - May 18, 2021**          8

1   attorneys, or representatives alleged that I was hired

2   as a CADD Tech I in the complaint?

3                    MS. VANDERSCHAAF:  Objection.  Form.

4   BY MS. HUBBARD:

5       Q    Miss Elbert's, have you ever alleged that I

6   was hired as a CADD Tech I?

7       A    As we reviewed last time on your offer letter,

8   the offer was for a CADD technician.  At the time, we

9   did not have multiple levels of CADD technicians, in

10  August 2017.

11      Q    Okay.  So if the clerk could pull up the

12  exhibit that I have loaded, that is called "Complaint"

13  you'll see Docket 01 Complaints.  If they could post up

14  for everyone to see, please?

15                    THE DIGITAL REPORTER:  Give me just one

16  moment.

17                    MS. HUBBARD:  Yes.

18  BY MS. HUBBARD:

19      Q    While she's doing that, Ms. Elberts, have you

20  ever -- has GEC ever billed me at a CADD Tech II rate?

21      A    Due to a clerical error?  Yes.

22      Q    Ms. Elberts did that --

23  BY MS. HUBBARD:

24      Q    -- that clerical error just happened one

25  occasion or several occasions?

1

1       THE UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3   _____

4   RACHEL M. HUBBARD,

5           Plaintiff,

6       v.                              Case No:

7   GASPEREC ELBERTS CONSULTING, LLC,       1:20-cv-06680

8           Defendant.

9   _____

10          VIDEOTAPED DEPOSITION OF MEGAN ELBERTS

11  DATE:           Tuesday, May 18, 2021

12  TIME:           2:03 p.m.

13  REPORTED BY:    Danielle Sargis, CER-1017

14  JOB No.:        6121

15

16  Conducted by videoconference via the Remote Legal

17  platform

18

19

20

21

22

23

24

25

2

1                     A P P E A R A N C E S

2      ON BEHALF OF PLAINTIFF:

3          RACHEL M. HUBBARD, PRO SE

4

5      ON BEHALF OF DEFENDANT:

6          VICTORIA VANDERSCHAAF, ESQUIRE

7          Litchfield Cavo LLP

8          303 West Madison Street, Suite 300

9          Chicago, Illinois 60606

10         vanderschaaf@litchfieldcavo.com

11         (312)781-6686

12

13         KEARNEY W. KILENS, ESQUIRE

14         Litchfield Cavo LLP

15         303 West Madison Street, Suite 300

16         Chicago, Illinois 60606

17         kilens@litchfieldcavo.com

18         (312)781-6630

19

20     ALSO PRESENT:

21         Lance Zacker, Remote Legal

22         Laurie DePalma, Notary Public

23

24

25

MEGAN ELBERTS - May 18, 2021                    20

```
1        Q      Yeah.   Page 3.

2        A      Okay.

3        Q      Do you recognize this email?

4        A      I do not.

5        Q      Okay.  Ms. Elberts is that your email address

6   in the CC on Page 3?

7        A      Yes, it is.

8        Q      Do you recognize the other people on this

9   email?

10       A      Yes, I do.

11       Q      Okay.  So we have Russ Olsen, Lisa Gasperec

12  and Christi Davidson?

13       A      Yes.

14       Q      And Adam Merry?  Is this a typical budget are

15  -- before you secure a job don't -- didn't you and the

16  other project managers and Lisa share emails about what

17  the proposal will look like?

18       A      On occasion.

19       Q      Okay.  On this particular occasion, and I

20  understand that you say you don't recall it, but in this

21  project was I budgeted at a CADD Tech II rate?

22       A      It appears for budgeting purposes, like you

23  said, a CADD Tech II rate was used.

24       Q      Was this a clerical error, Ms. Elberts?

25       A      I did not prepare this budget.  So I can't
```

1

```
 1              OF THE UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF ILLINOIS

 3                        EASTERN DIVISION

 4     _____

 5     RACHEL M. HUBBARD,

 6            Plaintiff,

 7        v.                              Case No:

 8     GASPEREC ELBERTS CONSULTING, LLC,     1:20-cv-06680

 9            Defendant.

10     _____

11            VIDEOTAPED DEPOSITION OF MARTIN BURKE

12     DATE:           Thursday, June 24, 2021

13     TIME:           2:35 p.m.

14     REPORTED BY:  Lisa Ann Lopez, CER-1178

15     JOB No.:        6458

16

17     Conducted by videoconference via the Remote Legal

18     platform

19

20

21

22

23

24

25
```

2

1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF:

3         RACHEL M. HUBBARD, PRO SE

4

5    ON BEHALF OF DEFENDANT:

6         VICTORIA VANDERSCHAAF, ESQUIRE

7         Litchfield Cavo LLP

8         303 West Madison Street, Suite 300

9         Chicago, Illinois 60606

10        vanderschaaf@litchfieldcavo.com

11        (312)781-6686

12

13        STEPHAN BERRIOS, ESQUIRE

14        Litchfield Cavo LLP

15        150 North Michigan Avenue, Suite 3300

16        Chicago, Illinois 60601

17        (312)894-3200

18

19   ALSO PRESENT:

20        Nick West, Remote Legal

21

22

23

24

25

**MARTIN BURKE - June 24, 2021**                7

1    BY MS. HUBBARD:

2         Q    Yes.  Good afternoon, and thank you, everyone.

3    Thank you, Mr. Burke, for being in attendance today.

4    Can you please state for the record, your title and

5    relationship to Mackie Consultants, LLC?

6         A    I am President of Mackie Consultants.

7         Q    Thank you.  And can you tell me how many years

8    Mackie Consultants LLC has been in existence?

9    Approximately even?

10        A    Mackie Consultants LLC has been in existence

11   for 10 years.

12        Q    Understood.  Can you tell me sir, do you

13   recall me?  Rachel Hubbard?

14        A    Yes, I do know who you are.

15        Q    Thank you.  And do you have knowledge of --

16   I'm sorry -- are you aware of the complaint that was

17   filed in this matter against Gasperec Elberts?

18        A    Only through the subpoena that I received.

19        Q    So are you saying you were unaware of a legal

20   matter involving Rachel Hubbard and Gasperec Elberts

21   prior to receiving a subpoena?

22             MR. BERRIOS:  Objection.  Misstates the

23   testimony.

24   BY MS. HUBBARD:

25        Q    May I ask Mr. Burke, when did you become aware

MARTIN BURKE - June 24, 2021                    8

1    -- I'm sorry.  Did you have any other knowledge of a

2    legal dispute between Rachel Hubbard and Gasperec

3    Elberts prior to receiving a subpoena?

4         A    Yes.

5         Q    And how did you receive that knowledge or

6    become aware?

7         A    Through a conversation with Megan Elberts.

8         Q    Okay.  And who is Megan Elberts to you?

9         A    She is my second cousin.

10        Q    And let me ask, do you recall, Mr. Burke, of

11   conducting an interview with me and Megan Elberts and

12   Russell Olsen?

13        A    I do not recall.

14        Q    Okay.

15        A    Do you recall on any interviews that occurred

16   involving GEC employees?

17             MR. BERRIOS:  Objection.  Form.

18   BY MS. HUBBARD:

19        Q    Do you recall any interviews with any GEC

20   employees in 2017?

21             MR. BERRIOS:  Objection.  Form.

22   BY MS. HUBBARD:

23        Q    Do you recall Mr. Burke, being involved in any

24   of the hiring of any GEC employees in 2017, 2018, or

25   2019?

Miller presented undisputed evidence that Raytheon made erroneous statements in its EEOC position statement." (In re Estate of Wallen, 262 Ill. App. 3d 61, 68–69, 633 N.E.2d 1350, 1357 (1994) Illinois courts have held that the failure to follow corporate formalities, even a non-shareholder, who is not an officer, director, or employee of a corporation, may be found individually liable for a judgment against a corporation where the non-shareholder exercises only equitable ownership and control over a corporation; the non-shareholder is liable even if there were no allegations that the non-shareholder engaged in any wrongdoing. (John Buckley and Mama Grimm's Bakery, Inc. v. Haithham Abuzir, 2014 IL App (1st) 130469 (April 10, 2014))

**WHEREFORE**, for all the reasons contained herein, Plaintiff pro se, Rachel M. Hubbard, respectfully requests that this Court give thoughtful consideration, in whole and in part, and grant Plaintiff's Motion For Leave to Amend Complaint and Add Parties.

**DATED: August 31, 2021**

**1:00 PM**

Respectfully Submitted by:

/S/ Rachel M. Hubbard_____
Rachel M. Hubbard, Plaintiff pro se

Rachel M. Hubbard
615 W. Talcott Road, #1
Park Ridge, Illinois 60068
847-361-8807
Hubbard2000@att.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2021, Plaintiff pro se served upon GEC her Response to Defendant's Response in Opposition to Plaintiff Motion For Leave to Amend Complaint and Add Parties via email at the following addresses. Defendant has asked Plaintiff not to provide paper copies due to Covid-19 conditions.

Ms. Victoria Vanderschaaf
vanderschaaf@litchfieldcavo.com

Ms. Kearney Kilens
kilens@litchfieldcavo.com

**DATED: August 31, 2021**

**1:00 PM**

Respectfully Submitted by:

/S/ Rachel M. Hubbard_____
Rachel M. Hubbard, Plaintiff pro se

Rachel M. Hubbard
615 W. Talcott Road, #1
Park Ridge, Illinois 60068
847-361-8807
Hubbard2000@att.net